UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

  vs.                 REPORT AND RECOMMENDATION

Todd NMN Jourdain, and
Robin Greg Kelly, Jr.,

        Defendants.        Crim. 06-313 (01-02) (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendants Todd NMN Jourdain ("Jourdain") and Robin Greg Kelly, Jr. ("Kelly"):

    1.    Kelly's Motion to Suppress Statements.

    2.    Kelly's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

    3.    Jourdain's Motion to Suppress Statements.

4.      Jourdain's Motion to Suppress Evidence Obtained as
a Result of Search and Seizure.

A Hearing on the Motions was conducted on October 27, 2006, at which time,

Jourdain appeared personally, and by Andrea K. George and Caroline Durham,

Assistant Federal Defenders; Kelly appeared personally, and by James E. Ostgard, II,

Esq.; and the Government appeared by David M. Genrich, Assistant United States

Attorney.  For reasons which follow, we recommend that each of the Defendants'

Motions be denied.

## II.  Factual Background

In an Indictment, the Defendants are each charged with one Count of Murder

in the Second Degree, in violation of Title 18 U.S.C. §§2, 1111, 1151 and 1153(a).

The alleged offenses are said to have occurred from on or about August 27, 2006,

within this State and District, and within the exterior boundaries of the Red Lake

Indian Reservation. As pertinent to these charges, and to the Defendants' Motions to

Suppress, the operative facts may be briefly summarized.[1]

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual
issues are involved in deciding a motion, the court must state its essential findings on
the record."  As augmented by our recitation of factual findings in our "Discussion,"
the essential factual findings, that are required by the Recommendations we make, are
contained in this segment of our Opinion.  Of course, these factual findings are
preliminary in nature, are confined solely to the Motions before the Court, and are
(continued...)

At the Suppression Hearing, the Government presented testimony from Patrick Graves ("Graves"), who is the Acting Director of Public Safety at the Red Lake Police Department ("RLPD"); Brian Peterson ("Peterson"), who is a criminal investigator with the RLPD; and Michael Thompson ("Thompson"), who is an agent with the Federal Bureau of Investigation ("FBI").   In addition, the parties stipulated to the admission of several documents into evidence, solely for the purposes of the Defendants' Motions.  See, <u>Governments Exhs. 1-14</u>; <u>All Parties Joint Exhs. 1-4</u>; <u>Government-Jourdain Joint Exhs 1-2</u>.[2]

On August 28, 2006, the RLPD received a report that Travis Feather ("Feather") was missing, and that he had last been heard from on August 26, 2006. See, <u>All Parties' Joint Exh. 1</u>  In the report, Feather's mother told law enforcement that she had last spoken with her son on August 26, 2006, at which time, he sounded

---

[1](...continued)
subject to such future modification as the subsequent development of the facts and law may require.  See, <u>United States v. Moore</u>, 936 F.2d 287, 288-89 (6th Cir. 1991); <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 610 (9th Cir. 1990).

[2]For purposes of these Motions, "Government-Jourdain Joint Exhibits" refer to those documents to which only the Government and the Defendant Jourdain have stipulated.

intoxicated. She also reported that her son had called from the Jourdain residence. Id.

Robert McClain ("McClain"), who is an officer with the RLPD, followed up on the missing person report, and visited Jourdain's residence, but he was unable to locate any of the residence's occupants. McClain subsequently spoke with Feather's mother, who told him that Feather was with Jourdain, and Kelly, at the Jourdain residence during her last telephone conversation with her son. Id. After this exchange, McClain contacted Kelly and asked him whether he had any helpful information. Kelly told McClain that he was with Feather on August 26, 2006, and that he had last seen an intoxicated Feather leaving the Jourdain residence at approximately 10:00 o'clock p.m. that evening. Id.

On August 28, 2006, Feather's mother visited the police station, and provided law enforcement with Feather's picture. At the Hearing, both Peterson and Graves testified that they were aware of the report concerning Feather's disappearance. Graves also testified that he was related to Kelly -- as a third cousin -- and that he had intermittent contact with him, as did Graves's son, on a monthly basis.

On August 28, 2006, at approximately 3:40 o'clock p.m., Graves received a telephone call from Kelly in his office, while he was on duty. Kelly requested that

Graves provide him with a ride home from work, and added that he needed to speak with Graves about an important matter. However, Kelly would not provide any further information over the telephone. Graves believed Kelly's demeanor, throughout the conversation, was atypical as Kelly did not seem his usual, jovial self. Instead, Graves thought Kelly sounded somber and troubled. Graves told Kelly that he was really busy, but that he would soon leave the police station to pick him up. After the phone call ended, Graves, as part of his ordinary practice when leaving the station, informed Peterson, as well as Dana Lyons Jr. ("Lyons"), who is an Acting Captain with the RLPD, that he was going to go pick up Kelly from work, and speak with Kelly, who reportedly had something important to tell him. Graves testified that a potential connection between Kelly's phone call, and Feather's disappearance, may have crossed his mind, and that he was also aware that Kelly had earlier been interviewed by McClain. Peterson testified that Graves had told him to "hang around" the police station until he returned. However, Graves believed that Kelly was going to tell him about either a personal, or family, matter.

At approximately 3:50 o'clock p.m., Graves arrived at Kelly's place of employment in his unmarked police vehicle. Kelly entered the vehicle and sat in the front passenger's seat. Graves began driving to Kelly's residence. During the course

CASE 0:06-cr-00313-RHK-RLE   Document 56   Filed 11/08/06   Page 6 of 62

of the drive, Kelly asked Graves if he remembered when he had told Kelly that he would love him no matter what.  After Graves acknowledged his promise, Kelly told Graves that "I f***ed up."  Graves asked him to clarify what he meant by that statement.  Kelly responded by telling Graves that, while he was drinking at the Jourdain residence, he was involved in a fight, and added that "we killed Travis Feather."  Graves immediately told Kelly not to say anything more to him.  Graves observed that Kelly was visibly upset, and that his hands were shaking, but that he was not crying.  Kelly asked if he could smoke a cigarette, which Graves permitted. Graves asked Kelly if he would be willing to speak with an investigator, and Kelly agreed to do so.  Graves called Peterson and told him that Kelly wished to speak with him, but he did not provide any other information.   Graves testified that he did not ask Kelly any other substantive questions, and that he informed Kelly, upon their arrival at the station, that he may have to testify against him.

Graves and Kelly arrived at the Red Lake Police Station approximately ten (10) minutes after Graves had initially picked Kelly up from work.  Graves and Kelly proceeded to Peterson's office, where Kelly was seated in front of Peterson's desk. At no time prior to, or during, the course of the initial interview was Kelly formally placed under arrest, or restrained with handcuffs.  Graves was dressed in his uniform

with his badge and firearm exposed.  Peterson was dressed in plain clothes and was also armed. Kelly declined an offer of food, but accepted a soft drink purchased by Peterson.  At the beginning of the interview, the only persons present with Kelly in the room were Graves, Peterson, and Leonard Red Cloud ("Red Cloud"), who is an officer with the RLPD.  Graves testified that Kelly asked him to remain present during the interview. At the Hearing, Graves and Peterson stated that they had previously interacted with Kelly on official police business.  Peterson also stated that he had no prior knowledge of the purpose, or the subject matter of the interview until it began, and that Kelly simply advised him that he "had something to tell me."

Throughout the course of the interview, Kelly's hands continued to tremble. He also stated that he had experienced difficulty in sleeping and eating, but did not provide further elaboration. Graves and Peterson testified that Kelly answered appropriately, and responsively, when questioned.  There was also no indication that Kelly was under the influence of drugs or alcohol.

The investigator's office, in which the interview was conducted, contained two (2) desks, a file cabinet, and several chairs.  Red Cloud was positioned behind Kelly, and Graves was also present in the interview room.  Kelly sat in front of Peterson's desk, at which Peterson was seated.

The interview began with Peterson asking several "administrative questions," which comprised of Kelly's name, date of birth, and other identifying information. Afterwards, Kelly was advised of his rights, see, Miranda v. Arizona, 384 U.S. 436 (1966), and he responded by orally waiving those rights, and memorialized his waiver in writing, by initialing the lines of the advisory on the waiver form, and signing the bottom of the form.  See, Government Exh. 1.   Peterson testified that he observed Kelly read and sign the form.  After each line of the form was read to him, Kelly was asked if he understood what was being asked of him, and he was afforded an opportunity to initial each advisory.  At no time did Kelly refuse to cooperate with law enforcement, and he never asked for an attorney.  In the course of the interview, Kelly drew a map, which provided the location of Feather's body in relation to the Jourdain residence.  See, Government Exh. 2.  At the conclusion of the initial interview, Kelly was afforded the opportunity to smoke a cigarette, and was escorted outside by Red Cloud and Graves.

Peterson then contacted John Egelhof ("Egelhof"), who is a Special Agent with the FBI.  Afterwards, Tim Ball ("Ball"), and Asher Silkey ("Silkey"), who are both agents with the FBI, arrived at the police station, where they were informed of the substance of what had been obtained during Kelly's initial interview. Peterson

- 8 -

testified that he had asked Kelly if he wanted to have the interview recorded -- an offer which he refused.  Silkey wished to have the interview recorded, but Peterson told Silkey of Kelly's refusal, so Silkey did not ask Kelly for permission to record the interview.

At approximately 5:52 o'clock p.m., on that same date, Silkey entered Peterson's office, where Kelly was seated.   Shortly thereafter, Graves left the interview room in order to secure the Jourdain residence, where Kelly said the incident resulting in Feather's death occurred.  Silkey identified himself to Kelly, and advised him that he was aware of Kelly's initial interview with Peterson,  See, <u>All Parties Joint Exh. 3</u>.  Silkey was dressed in plain clothes with his firearm concealed.  Silkey told Kelly that he was doing "the responsible thing" by coming forward with information, and that he would like to re-advise Kelly of his rights.  <u>Id</u>. at p. 1.

Silkey advised Kelly of his rights by reading, verbatim, from an "Advice of Rights" form, after which he asked Kelly whether Kelly would waive his rights.  Kelly waived his rights and signed the Advice of Rights form.  See, <u>Government Exh. 5</u>.  The interview was not recorded, but the substance of the interview was summarized in Silkey's report.  <u>All Parties Joint Exh. 3</u>.  Silkey also informed Kelly that he would

- 9 -

potentially be arrested after the interview.  At that point, Kelly related the events surrounding Feather's disappearance.

Kelly stated that he was drinking at the Jourdain residence for most of the day, and evening, of August 26, 2006.  Kelly, Feather, and Jourdain, collectively consumed three (3) liters of brandy, as well as a case of beer.  Kelly stated that a fight arose between the men, but that everything "was a blur."  Id. at p. 2.  When Kelly woke up the next morning -- at approximately 9:00 or 10:00 o'clock a.m. --  he and Jourdain discovered Feather lying on the lawn of the Jourdain residence.  Upon examination, they determined that Feather was dead.  Kelly told Silkey that he had hit and kicked Feather, but did not remember why he had done so.  When asked of Jourdain's involvement in the matter, Kelly responded that "Jourdain can speak for himself," and that he did not know if Jourdain had kicked or hit Feather.   Id.

Kelly remembers that he had left Feather, who he stated was his friend, on the ground the previous evening, and that he entered the Jourdain residence in order to sleep.  Kelly believed that Feather was "knocked out drunk."  Id.  However, he observed that Feather was bleeding from both his head and mouth.  Upon discovering Feather's body, Kelly and Jourdain "freaked out" and then quarreled with one another over what action they should take.

- 10 -

In the course of the interview, at 6:30 o'clock p.m., Peterson left the office and Silkey advised Kelly to take a break until Peterson returned. Kelly asked Silkey if he would be taken to the Beltrami County Jail, in Bemidji, Minnesota, and Silkey responded that Kelly would be arrested if the information that he had provided was indeed true. Kelly stated that he had been telling the truth, and that he was willing to take law enforcement to Feather's burial site.

At approximately 6:37 o'clock p.m., Silkey advised Kelly that he was being placed under arrest for Feather's murder, at which point, Silkey reread the warning provided on the Advice of Rights form. Kelly waived his rights and signed another waiver form. See, Government Exh. 6. Kelly proceeded to tell Silkey of the events surrounding Feather's burial. Silkey advised Kelly that this was his opportunity to tell the truth about his, as well as Jourdain's, involvement in Feather's death. Kelly stated that he did not beat Feather by himself, and that he had seen Jourdain hit Feather, and that Kelly and Jourdain both "piled" upon Feather. Id. at p. 4. Kelly stated that Jourdain hit and kicked Feather, and that they were both beating Feather at the same time. Kelly was unsure if Jourdain hit Feather in the head.

At approximately 7:02 o'clock p.m., Kelly declined an invitation for a break, although a break was subsequently taken at approximately 7:08 o'clock p.m. Kelly

also went outside, while accompanied by Peterson and Graves, in order to smoke a cigarette at 7:11 o'clock p.m.

At approximately, 7:22 o'clock p.m. that evening, Kelly executed a Consent to Search form, which had been provided by the FBI, and which authorized a search of the residence where Kelly was staying. See, Government Exh. 7. Kelly also provided a written statement, which was transcribed by Silkey. See, Government Exh. 8. Kelly stated that he possessed a twelfth (12) grade education, but that he had not received a diploma. He also advised that he was capable of reading and writing, and that he understood the contents of the transcribed statement. Kelly made several changes to the statement, and initialed each of those changes, as well as the bottom of each of the two (2) paragraphs which comprised the written statement. The written statement records that it was produced voluntarily, in the absence of any threats or promises, and that it was provided of Kelly's "own free will and without coercion." Id.

Kelly told Silkey that he believed that Feather "died from Jourdain and Kelly beating him." All Parties Joint Exh. 3. Kelly also stated that no one else was present at the Jourdain residence who could have hurt Feather, and that it was not cold enough for the weather to have resulted in Feather's death. Id. at p. 5.

Kelly provided Silkey with Jourdain's telephone number, and represented that Jourdain was currently receiving treatment at a detoxification center in Pine Manor. At 7:55 o'clock p.m., Kelly agreed to direct Silkey, and Peterson, to Feather's burial site, and the interview at Peterson's office concluded.

Kelly, Silkey, and Peterson, drove together to Jourdain's residence, where Kelly was allowed to smoke a cigarette. Upon arrival at the residence, Kelly pointed to where he and Jourdain buried Feather, where he burned his shoes, and where one of the shovels used in burying Feather was kept. At approximately 8:29 o'clock p.m., Kelly, Silkey, and Peterson, left the Jourdain residence, and proceeded to the Beltrami County Jail. They arrived at approximately 9:06 o'clock p.m., at which time, Kelly advised that he was sober, and that he had not consumed any drugs or alcohol that day. Kelly then executed a consent form to allow Silkey to obtain DNA buccal swabs from Kelly. Id. at 6; see also, Government Exh. 9.

On August 29, 2006, at approximately 11:00 o'clock a.m., Thompson received a phone call from Egelhof, during which he was advised that a Warrant had been issued for Jourdain's arrest. Thompson testified that he received a facsimile copy at the Crookston Police Department ("CPD"). Upon receipt, Thompson went with another FBI agent, as well as two (2) officers affiliated with the CPD, to the

detoxification center where Jourdain was receiving treatment. Thompson and the other law enforcement officials entered the reception area, where they met with hospital staff. They approached Jourdain, who was in the middle of a telephone conversation. Upon the conclusion of his call, Thompson informed Jourdain that there was a Warrant issued for his arrest. Jourdain changed out of his hospital clothes, and into his personal garments, and was then handcuffed. He was then escorted to the police vehicle, with clothing draped over his hands to conceal the handcuffs. No weapons were displayed in the course of Jourdain's arrest, or interview.

After departing from the detoxification center, Jourdain did not engage in any substantive discussion or conversation with law enforcement. Upon the arrival at the police station, Jourdain was provided a copy of a Warrant, and was asked if he would be willing to be interviewed. Thompson advised Jourdain that, before he could proceed, he needed to advise him of his rights.

Thompson testified that Jourdain was cooperative and expressed his willingness to be interviewed. Jourdain also stated that he had an attorney and, in response, law enforcement asked whether he wished to speak with his attorney at that time. Jourdain stated he did not want to contact an attorney. Jourdain was subsequently provided with a form which advised him of his rights. Jourdain was orally advised of his rights,

and he expressed his desire to waive those rights, at which time, one of the FBI agents provided a checkmark next to the waiver of rights.  See, Government Exh. 12. Jourdain further advised that he had not eaten earlier, and stated that he was hungry. In response, Thompson provided Jourdain with a hamburger, as well as some french fries.  Thompson testified that after Jourdain was finished with his meal, the FBI agent who accompanied Thompson re-advised Jourdain of his rights, and he was provided a second, slower reading of Jourdain's rights.  At that time, Jourdain signed the waiver form.

Thompson testified that Jourdain answered appropriately to questioning, and that he made eye contact with Thompson throughout the interview.  However, after several statements made over the course of ten (10) minutes, Jourdain advised that he wished to terminate the interview.  He was then afforded the opportunity to make a phone call, and the interview was terminated.

### III.  Discussion

A.   Kelly's Motion to Suppress Statements.

1.   Standard of Review.  Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official

interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984). Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning. See, Miranda v. Arizona, supra at 473; see also, Dormire v. Wilkinson, 249 F.3d 801, 804 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, supra at 322, quoting California v. Beheler, 463 U.S. 1121, 1125 (1983). A list of common indicia of custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect

> initiated contact with authorities or voluntarily acquiesced
> to official requests to respond to questions; (4) whether
> strong arm tactics or deceptive stratagems were employed
> during questioning; (5) whether the atmosphere of the
> questioning was police dominated; or (6) whether the
> suspect was placed under arrest at the termination of the
> questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir 1990); see, United States v.
Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006); United States v. Czichray, 378 F.3d 822,
827 (8th Cir. 2004), cert. denied 544 U.S. 1060 (2005); United States v. Axsom, 289
F.3d 496, 500, 501 (8th Cir. 2002).

However, these factors "are by no means exhaustive and should not be applied

ritualistically, counting indicia which contribute to custody against those which

detract."  United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing

United States v. Czichray, supra at 827.  Instead, the Griffin factors serve as a guide

to the resolution of the ultimate inquiry of "whether the defendant was restrained as

though he were under formal arrest."  See, United States v. Czichray, supra at 827.

    Whether or not Miranda is implicated, the Supreme Court has recognized that,

in order for a confession to be admitted into evidence, it must be voluntary if it is to

satisfy the Fifth Amendment's right against self-incrimination.  See, Dickerson v.

United States, 530 U.S. 428, 433-34 (2000).  For a confession to be considered

voluntary, a Court must examine "'whether a defendant's will was overborne' by the

circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693

(listing the applicable considerations). However, "[w]e cannot find that a statement was involuntary unless it is established that law enforcement officials engaged in coercive activity." United States v. Bordeaux, 400 F.3d 548, 560 (8th Cir. 2005).

2.  Legal Analysis. Kelly has challenged the admissibility of three (3) sets of statements that he made to law enforcement:  1) statements that he made while in Graves' vehicle after he was picked up from work; 2) statements that he made during his initial interview with Peterson; and 3) statements that he made during his interview with Silkey.  We address the circumstances underlying each set of Kelly's statements, in turn.

a.  Kelly's Motion to Suppress Statements Made While in Graves' Vehicle.  Here, Kelly does not argue that the statements he made while in Graves' vehicle were the result of a custodial interrogation, but instead, he solely contends that those statements were made involuntarily.[3]  Specifically, Kelly contends that his

_____

[3]Even if we construe Kelly's Motion as seeking to suppress the statements as the result of a failure to issue a Miranda warning prior to a custodial interrogation, we find that Kelly was not "in custody" at the times that any statements were made.  In applying the Griffin factors, see, United States v. Griffin, supra at 1349, we note that Kelly initiated the interview by contacting Graves and asking for a ride home from work, and he stated that he had something important he wished to discuss with Graves.  Kelly was not arrested at any time during, or immediately following, the car ride, and Graves uncontroverted testimony is that he was merely driving his cousin
(continued...)

statements were rendered involuntary as a result of his "young age, and lack of maturity and intelligence, his intoxication, his lack of food and sleep prior to the interrogation, the lack of any warning about rights prior to the initial interrogations, and appeals by the officer to the defendant's emotions, taking advantage of [Kelly's] emotional state of mind." Kelly's Motion for Suppression of Confessions or Statements, Docket No. 38, at p. 1.

Here, we find that Kelly's statements, which were made during the trip in Graves' car, were voluntarily given. Notably, the Record is devoid of any evidence that Graves made any threats or promises to Kelly, or used any coercive tactics during the questioning. Similarly, no suggestion has been made that Kelly failed to understand the nature of the conversation, or his ability to refrain from answering Graves's questions. In fact, Graves did not apparently ask Kelly any questions which

---

[3](...continued)
home from work, as Kelly had requested. At no time did Graves initiate questioning, or even ask anything about the Feather investigation, and only asked Kelly to clarify what he meant by stating that he had "f***ed up." At no time was Kelly placed in restraints, or had his freedom of movement restrained in any manner, other than those restraints incident to car travel. Graves did not dominate the conversation, as he allowed Kelly to control the conversation and, as soon as Kelly made an incriminating statement, Graves advised Kelly not to say anything further to him. In sum, we find no basis to conclude that Kelly was subject to custodial interrogation while in Graves' vehicle, and accordingly, the lack of any advisement as to Kelly's rights, at that time, does not necessitate any suppression of his statements on that basis.

elicited any substantive response, other than for him to clarify what he meant when he said that he "f***ed up." Rather, Graves's uncontradicted testimony reflects that Kelly appeared to understand the circumstances of their conversation, given that he spoke thoughtfully, somberly, and was clearly aware of the import of the information he was providing his cousin.

While Kelly argues that Graves appealed to Kelly's emotions, and took advantage of Kelly's emotional state of mind, we find no evidence to support the claim. Undoubtedly, Kelly was emotionally affected by what he chose to tell Graves, but there is no showing in this Record that Graves played upon that emotional state. In fact, Graves simply listened to Kelly and, when a potentially incriminating statement was made, he advised Kelly not to speak further to him. Given this Record, we find no intimation of coercion, on Graves' part, to induce Kelly to speak to him. Moreover, there is no evidence that Kelly was under the influence of any drugs or alcohol throughout the interview, as Graves testified that Kelly appeared sober. Given the circumstances which led to Kelly's request for a ride home, and Graves' familiarity with Kelly, we see no reason for Graves to advise Kelly of his rights -- especially when Kelly does not allege, let alone prove, that his ride with Graves was custodial in nature.

Furthermore, there is no suggestion that Kelly, who was twenty (20) years old at the time of the statements, see, <u>All Parties Joint Exh 2.</u>, and who possessed a twelfth (12) grade education, see, <u>All Parties Joint Exh 3.</u>, at p. 4, was incapable of understanding the nature of his statements, or that his will was overborne in discussing the previous days' events with Graves. Lastly, although Kelly alluded to a lack of sleep and food, we find no evidence that either circumstance rendered his statements involuntary.[4]   See, <u>United States v. Casal</u>, 915 F.2d 1225, 1229 (8th Cir. 1990), cert. denied 499 U.S. 941 (1991)(defendant's lack of sleep for five (5) days, and intoxication owing to methamphetamine use, did not render confession involuntary); <u>United States v. Petary</u>, 857 F.2d 458, 461 (8th Cir. 1988)(finding statements voluntary, even though defendant "had not slept for approximately twenty-four hours and had consumed beer but no food."). In sum, we find that, under the totality of the

---

[4]We note that Kelly never described how long he had gone without eating, or sleeping.  We merely note that in his statements to police he noted that he had slept prior to discovering Feather's body less than forty-eight (48) hours before the statements.  Furthermore, the effect of lack of food is not corroborated by the fact that Kelly turned down an offer of food prior to his interview with Peterson, a mere ten (10) minutes after his statements to Graves.  While, undoubtedly, the circumstances that Kelly described to law enforcement could impact upon a person's capacity to sleep, this Record is devoid of any showing that lack of sleep, or loss of appetite, led to an overpowering of Kelly's will that would render any of his statements involuntary.

circumstances, Kelly's statements, which were made during the ride with Graves, were entirely voluntary, and Kelly's Motion to Suppress those statements should be denied.

        b.    <u>Kelly's Motion to Suppress Statements Made During the Peterson Interview</u>.

The Record is uncontested that, prior to the interview with Peterson occurring, Kelly was advised of his <u>Miranda</u> rights, and that he waived those rights by signing a "Waiver of Rights" form, which contained the statement: "I have read this statement of my rights and I understand what my rights are," and "[a]t this time, I am willing to answer questions without a lawyer present." See, <u>Government Exhibit 1</u>. Accordingly, since there is nothing in the Record to suggest that any of the officers utilized coercive tactics, such as threats or promises, in order to procure that waiver, we find that Kelly knowingly, intelligently, and voluntarily, waived his <u>Miranda</u> rights.

Moreover, under the "totality of the circumstances," we also find that Kelly's statement was voluntarily given. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." <u>United States v. Astello</u>, 241 F.3d 965, 966 (8th Cir. 2001), cert. denied, 533 U.S. 962 (2001),

- 23 -

quoting <u>Berkemer v. McCarty</u>, supra at 433; see, <u>United States v. Annis</u>, 446 F.3d

852, 856 (8th Cir. 2006)("[M]aintaining that a statement is involuntary even though

given after warnings and voluntary waiver of rights requires unusual stamina, and

litigation over voluntariness tends to end with the finding of voluntary waiver."),

quoting <u>Missouri v. Siebert</u>, 542 U.S. 600, 609 (2004).

      As our Court of Appeals has recognized:

> To state the obvious, "interrogation of a suspect will
> involve some pressure because its purpose is to elicit a
> confession." [United States v. Astello, 241 F.3d 965, 967
> (8th Cir. 2001), cert. denied, 533 U.S. 962 (2001)]. "[T]he
> fact that the tactics produced the intended result * * * does
> not make a confession involuntary." Id. at 968. In other
> words, 'there is nothing inherently wrong with efforts to
> create a favorable climate for confession." United States v.
> LeBrun, 306 F.3d 545, 555 (8th Cir. 2002)(internal citations
> omitted. "'[Q]uestioning tactics such as a raised voice,
> deception, or a sympathetic attitude will not render a
> confession involuntary unless the overall impact of the
> interrogation caused the defendant's will to be overborne.'"
> Astello, 241 F.3d at 967 (quoting Jenner v. Smith, 982 F.2d
> 329, 334 (8th Cir. 1993)). Nor will a promise of leniency,
> an "expressed disbelief in the statements of a suspect * * *,
> or lie[s] to the accused about the evidence against him"
> necessarily render a confession involuntary. Wilson v.
> Lawrence County, 260 F.3d 946, 953 (8th Cir. 2001)
> (internal citations omitted). Rather, the coercive conduct
> must be "such that the defendant's will was overborne and
> his capacity for self determination critically impaired."
> Astello, 241 F.3d at 967 (internal citations omitted).

United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002); see, United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005); United States v. LeBrun, 363 F.3d 715, 725-26 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005); see also, United States v. Martin, 369 F.3d 1046, 1052-53, 1056 (8th Cir. 2004).

As was true with Kelly's statements in Graves' vehicle, we find no responsible basis upon which to conclude that the Defendant's will was overborne by the questioning techniques that were employed by Peterson, or because of any of Kelly's individual characteristics.

The uncontroverted testimony at the Hearing, from Graves, established that Kelly voiced no objection to speaking with an investigator when asked.  Notably,  no threats or promises were made during the interview, and Kelly had prior experience with police investigatory techniques, arising with his previous encounters with law enforcement. See, Government Exh. 3.  Furthermore, his relative, who was the Acting Director of the police department, stayed in the interview room at Kelly's request.  In questioning Kelly, there is no evidence that Peterson spoke with a raised voice, and there has been no suggestion that any of the law enforcement present employed any methods of physical intimidation.  Rather, our review of the circumstances of Kelly's interview reveals that Kelly's statements, in response to Peterson's questions, were made of his own volition, and without coercion.  Therefore, based on the totality of

the circumstances, we find that Kelly's statements to Peterson were knowing and voluntary, and should not be suppressed.

      c.     <u>Kelly's Motion to Suppress Statements from Silkey Interview.</u>

Much his previous interview with Peterson, we find that Kelly knowingly, intelligently, and voluntarily, waived his <u>Miranda</u> rights -- and did so on two separate occasions during his interactions with Silkey -- both at the onset of the interview, as well as after being placed under arrest during the course of the interview. Prior to any questioning, Silkey advised the Defendant of his <u>Miranda</u> rights, and he presented the Defendant with an "Advice of Rights" form, which Kelly signed -- thereby expressly acknowledging that he understood his rights, and that he was willing to waive those rights and proceed without the presence of an attorney. Moreover, the Record is bereft of any suggestion that Silkey employed any coercive tactics, or deceptive techniques, in eliciting that waiver -- on either occasion.  In addition, Kelly stated that he voluntarily decided to come to the police department to offer his statements as he "couldn't handle that sh*t," since Feather was his friend. See, <u>All Parties Joint Exh. 3.</u>, at p. 3.  Finding no basis to suppress any of Kelly's previous statements to Peterson, under similar circumstances that preceded Silkey's

interview, we find that Silkey's subsequent follow-up interview was not tainted by any impropriety in the prior interviews.

Therefore, since we find that each of the Defendant's statements were voluntary, and were not otherwise obtained in violation of the protections set forth in Miranda v. Arizona, supra, we recommend that Kelly's Motion to Suppress Statements be denied.

      B.    Kelly's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

Kelly's Motion encompasses two separate searches -- a search of Kelly's residence, pursuant to Kelly's consent, as well as a search, pursuant to a Warrant, of Kelly's person to obtain DNA samples, to which Kelly had also provided his consent. We address the constitutionality of each search in turn.

      1.    The Search of Kelly's Residence. "Searches without a warrant are per se unreasonable subject to a few well established exceptions." United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004). However, "[a]n officer with consent needs neither warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), quoting United States v. Jenkins, 92 F.3d 430, 436 (8th Cir. 1996), citing in turn, Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness

of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given," Schneckloth v. Bustamonte, supra at 219, quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968), "and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority." United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005), citing Bumper v. North Carolina, supra at 548-49. The voluntariness of a consent is determined from the totality of the circumstances. Schneckloth v. Bustamonte, supra at 227.

Here, Kelly consented to the search of his home, during his interview with Silkey on August 28, 2006. Although his consent was obtained during the course of the interview, and while in the presence of several law enforcement officers, Silkey specifically provided Kelly with a "Consent to Search" form. See, Government Exh. 7; All Parties Joint Exh. 3. The signed form memorializes that Kelly had been advised of his right to refuse consent, that his consent was voluntary, and that he authorized the agents to take any items which they determined were related to their investigation. See, Government Exh. 2. There has been no intimation that Kelly did not understand the effect of his consent, or that his signature on the form was somehow coerced. Accordingly, we are satisfied that Kelly's consent "was the product of an essentially free and unconstrained choice, and that [Kelly] comprehended the choice that he * *

\* was making." See, <u>United States v. Sanders</u>, supra at \*3, quoting <u>United States v. Cedano-Medina</u>, 366 F.3d 684 (8th Cir. 2004), cert. denied, 543 U.S. 1035 (2004). Moreover, since Kelly had specifically mentioned that his clothes could be located in a room in his residence prior to signing the "Consent to Search" form, and the form authorized a "complete search" of the residence, we also find that the search and seizure did not exceed the scope of the consent given. See, <u>United States v. Parker</u>, 412 F.3d 1000, 1001-1002 (8th Cir. 2005)(finding that scope of consent not exceeded when defendant told law enforcement where incriminating evidence was hidden); <u>United States v. Hines</u>, 387 F.3d 690, 695 (8th Cir. 2004)(law enforcement officers who searched an unattached garage did not exceed the scope of consent where the defendant signed a consent form authorizing the search of an attached garage, where the residence had only an unattached garage); <u>United States v. Coffman</u>, 148 F.3d 952, 953 (8th Cir. 1998)(defendant's consent to search home encompassed searching under the defendant's bed and his pillow).

Therefore, concluding that the search of Kelly's residence was conducted in accordance with Kelly's voluntary consent, we recommend that his Motion to Suppress the evidence obtained during the search of the residence be denied.

2.    <u>The Search and Seizure of Evidence from Kelly's Person</u>.

- 29 -

a. <u>Standard of Review</u>. In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached, Judicial Officer will assess the underlying factual circumstances in ascertaining whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband. See, <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996). In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place. See, <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993). For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); see also, <u>Ornelas v. United States</u>, supra at 695.

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodman</u>, 165 F.3d 610, 613

(8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. See, United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002). Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. Illinois v. Gates, supra at 236.

      b.   Legal Analysis. Kelly has asked that we review the Search Warrant, which was issued on September 5, 2006, in determining whether the Warrant was supported by probable cause, or contained any other constitutional defects. Since no challenge has been made to the execution of the Warrant, we focus our attention on the "four corners" of the Warrant, in order to determine if probable cause was

shown for its issuance, or if other fatal defects would justify the suppression of any

evidence secured by the Warrant's execution.

In support of the Application for the Warrant, Silkey recounted the events

which led to Kelly's interviews on August 28, 2006, and the information obtained

from those interviews.  See, Affidavit of Asher L. Silkey, Government Exh. 10, at pp.

1-2.  Specifically, Silkey averred that Kelly told him that Kelly, as well as Jourdain,

had been fighting with Feather on August 27, 2006, and that Feather was bleeding

from the mouth, and appeared to be unconscious.  Id. at p. 2.  Kelly and Jourdain

awoke the following morning, and discovered Feather was dead.  They obtained

shovels from another house, and dragged Feather's body into the brush, and buried

him.  Id.  Kelly also recounted that he escorted investigators to a location where

Feather had been buried, where they uncovered a body.  The investigators also

discovered certain human blood smears in the Jourdain residence, fingerprints, and

hair samples -- which still contained the hair's root -- which were inconsistent with

the length of Feather's hair.   Id. at pp. 3-4.  Silkey averred that law enforcement

technicians are trained and experienced in obtaining DNA extractions from blood and

hair samples which contain a root, and in comparing them with samples taken from

a buccal swab. Id. at pp. 4-5.  Based upon that information, Silkey believed that there

was probable cause to conclude that evidence, such as that obtained from two (2) buccal swabs, and representational samples of plucked and rubbed head hair, and full palmer "major case" fingerprints from Kelly, would demonstrate that Kelly was involved in the death of Feather.

On this showing, we find that there was ample probable cause to support the issuance of the Search Warrant. Specifically, according to the Affidavit, the information that had already been gathered disclosed that the Kelly had fought with Feather prior to his death, and that he had hit and kicked him. Moreover, the Affidavit established that physical evidence, which had been obtained from the Jourdain residence, where Kelly had admittedly struck Feather, could potentially match the DNA that would be obtained from a buccal swab of Kelly. As previously related, we find no reason to suppress Kelly's statements to law enforcement, which undergird Silkey's averments, and accordingly, we find ample probable cause to support the Search Warrant.

Even if probable cause were absent, Kelly expressly consented to providing law enforcement with DNA buccal swabs by signing a "Consent to Search" form, which recounted that he was advised of his right to refuse his consent, and that his permission to search was given voluntarily. See, Government Exh. 9. As was true

with respect to Kelly's consent to a search of his residence, there has been no suggestion that Kelly misapprehended the effect of his consent, or that his signature on the form was somehow coerced. Accordingly, we are satisfied that Kelly's consent to providing a DNA buccal swab sample was freely given, and that, even if we concluded that probable cause for the Warrant were lacking -- which we do not do under the circumstances here -- there is no basis for suppression.

The Defendant has not drawn our attention to any other constitutional defect in the Search Warrant, nor does our independent review disclose any. Therefore, having found that the Search Warrant was supported by adequate probable cause, and that the samples were obtained in accordance with Kelly's consent, we recommend that the Kelly's Motion to Suppress the evidence obtained from his person be denied.[5]

C.     Jourdain's Motions to Suppress.

––––––––––––––––––––––

[5]Even if the information in the Search Warrant was insufficient to establish probable cause, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because the Warrant was "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984). Accordingly, even if probable cause were lacking, and we concluded that the search was not consensual, we would still recommend that Kelly's Motion to Suppress Evidence Obtained from Search Warrant be denied.

Jourdain's Motions to Suppress assert that his arrest, and the subsequent search of his residence on August 29, 2006, were without probable cause. Jourdain further contends that his statements to Thompson were taken without a valid waiver of his constitutional rights under Miranda v. Arizona, supra, and were otherwise the fruit of his unlawful arrest.  Prefatory to addressing those Motions, we consider the constitutionality of Jourdain's arrest.

      1.    Probable Cause for the Issuance of the Bench Warrant and Jourdain's Arrest.

          a.    Standard of Review.  "Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964).  As we have noted, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual concepts" and, as such, is "not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983); see also Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001); Ornelas v. United States, 517 U.S. 690, 697 (1996).

We recognize, and accept, that an officer engaged in an arrest need not personally have found probable cause in order to lawfully effect the arrest.  As the Court explained, in United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001), cert. denied, 534 U.S. 982 (2001):

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory, United States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000), to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure.  Under this rationale, the validity of a search "may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if * * * some degree of communication exists between them," id.  See also United States v. Morales, 238 F.3d 952, 953 (8th Cir. 2001), and United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997). The requirement that there be a degree of communication serves to distinguish between officers functioning as a "search team," United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989), and officers acting as independent actors who merely happen to be investigating the same subject.

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'"  Tokar v. Bowersox, supra at 1047, quoting United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983).  We keep in mind, however, that

"[p]robable cause does not require a prima facie showing of criminal activity, but only

the probability of criminal activity." Id.

        b.    Legal Analysis.  As a threshold matter, we note that, at the

Hearing, counsel for Jourdain attempted to engage in a line of questioning with

Peterson, whose purpose was to attack the factual accuracy of the averments made in

the Affidavit in Support of the Warrant for Jourdain's arrest.  Upon objection from the

Government, that counsel for Jourdain was conducting discovery for the purpose of

collaterally attacking his Arrest Warrant, we were persuaded by counsel for Jourdain

that the Suppression Hearing was the only opportunity at which the issue of probable

cause for the arrest could be challenged.   While we agree with Jourdain, that a

Suppression Hearing is the appropriate venue for contesting the probable cause for an

arrest, and correlatively, the admissibility of statements made after that arrest, see,

United States v. Chauncey, 420 F.3d 864, 870 (8th Cir. 2005)(analyzing whether

probable cause supported the defendant's statements, and accordingly, whether post-

arrest statements should be suppressed); United States v. Grays, 46 F.3d 1136, 1995

(8th Cir. 1995)(Table Decision), we plainly erred in not requiring Jourdain to make the

"substantial preliminary showing" required by Franks v. Delaware, 438 U.S. 154

(1978).   See, United States v. Carpenter, 422 F.3d 738, 745 (8th Cir. 2005)("A

defendant is entitled to a Franks hearing if he make a substantial preliminary showing that a false statement was included in the warrant affidavit either intentionally or with reckless disregard for the truth and the information was necessary to the finding of probable cause."), citing <u>United States v. Fairchild</u>, 122 F.3d 605, 610 (8th Cir. 1997).

Although <u>Franks</u> involved an allegedly fraudulent Affidavit in support of a Search Warrant, surely the seizure of a person, pursuant to an Arrest Warrant, is as constitutionally important, as the seizure of incriminating evidence, or the fruits of a crime, and the Courts have applied <u>Franks</u> to the evaluation of Arrest Warrants. See, e.g., <u>Bagby v. Brondhaver</u>, 98 F.3d 1096, 1099 (8th Cir. 1996)(considering the application of qualified immunity in the context of a <u>Franks</u> challenge to an Arrest Warrant for Section 1983 purposes); <u>United States v. Harrison</u>, 400 F. Supp.2d 780, 785-86 (E.D. Pa. 2005); <u>United States v. Colkley</u>, 899 F.2d 297, 299 (4th Cir. 1990); <u>In re Extradition of Powell</u>, 4 F. Supp.2d 945, 955-56 (S.D. Cal. 1998); <u>United States v. Padilla</u>, 986 F. Supp. 163, 168-69 (S.D.N.Y. 1997). We conclude, therefore, that Jourdain was obligated to proffer a sufficient showing of falsity in order to challenge his Arrest Warrant through a <u>Franks</u> Hearing.

The showing required for a <u>Franks</u> Hearing, has been described as follows:

> To mandate an evidentiary hearing, the challenger's attack
> must be more than conclusory and must be supported by

> more than a mere desire to cross-examine.  There must be
> allegations of deliberate falsehood or of reckless disregard
> for the truth, and those allegations must be accompanied by
> an offer of proof.  They should point out specifically the
> portion of the warrant affidavit this is claimed to be false;
> and they should be accompanied by a statement of
> supporting reasons.  Affidavits or sworn or otherwise
> reliable statements of witnesses should be furnished, or
> their absence satisfactorily explained.  Allegations of
> negligence or innocent mistake are insufficient.

Franks v. Delaware, supra at 171.

Here, Jourdain offered no such showing, but simply registered his interest in cross

examining the witnesses to determine if a Franks Hearing were warranted.  As our

Court of Appeals has made plain, Suppression Hearings should not be expanded so

as to elude "the very limited circumstances in which a Franks v. Delaware hearing is

appropriate."  United States v. Ozar, 50 F.3d 1440, 1445 (8th Cir. 1995), cert. denied,

516 U.S. 871 (1995), citing United States v. Shields, 783 F. Supp. 1058, 1064-65

(N.D. Ill. 1991).

Nevertheless, a Record has now been proffered to us, and we examine that

Record to determine whether, as a supplement to Jourdain's original showing, a

Franks Hearing is warranted.  As the Court explained, in United States v. Lucca, 377

F.3d 927, 931 (8th Cir. 2004):

> This showing of deliberate or reckless falsehood is "not
> lightly met."  United States v. Wajda, 810 F.2d 754, 759

> (8th Cir. 1987).  In particular, a defendant must "point out
> specifically the portion of the warrant affidavit that is
> claimed to be false; and [the allegations] should be
> accompanied by a statement of supporting reasons.
> Affidavits or sworn or otherwise reliable statements of
> witnesses should be furnished, or their absence
> satisfactorily explained." Franks, 438 U.S. at 171, 98 S.Ct.
> 2674.

See also, United States v. Anderson, 243 F.3d 478, 482 (8th Cir. 2001)("[Defendant]
provided no evidence, however, to support his conclusory contention [that warrant
affidavit was intentionally or recklessly false], and without it he cannot meet his
burden under Franks, because '[a] mere allegation standing alone, without an offer of
proof in the form of a sworn affidavit of a witness or some other reliable
corroboration, is insufficient to make the difficult preliminary showing,' United States
v. Mathison, 157 F.3d 541, 548 (8th Cir. 1998), cert. denied, 525 U.S. 1089, 119 S.Ct.
841, 142 L.Ed.2d 696 (1999).

Having closely vetted the evidence, we conclude that nothing offered by Jourdain

satisfies the requisite preliminary showing.

In support of the Criminal Complaint -- which led to the issuance of a Bench

Warrant for Jourdain's arrest -- Egelhof, who is a Special Agent with the FBI, and

who has the primary responsibility for investigating violent crimes on the Red Lake

Indian Reservation, submitted an Affidavit which detailed the information which

caused him to suspect that Kelly and Jourdain, "without just cause or excuse and with

malice aforethought, did unlawfully kill [Feather.]"  See, Affidavit of John Egelhof,

Docket No. 1, at pp. 4-5.

- 40 -

The initial portion of Egelhof's Affidavit details the investigation into Feather's disappearance, and that Kelly had "asked to speak to an officer of the RLPD with whom he was familiar." Id. at p. 1. Egelhof recounted that "Kelly disclosed to that officer that he, Jourdain and Feather had been together at Jourdain's home in the Little Rock section of the reservation, and, while there, he and Jourdain had beaten Feather to death and then buried him." Id. Egelhof then summarized the information obtained from Kelly's subsequent interviews with Peterson and Silkey. Egelhof averred as follows:

> At approximately 2:00 a.m. on the following morning, August 27, 2006, Kelly, Jourdain, and Feather started fighting outside the Jourdain house. The fight turned into Kelly and Jourdain against Feather, in which both Kelly and Jourdain beat Feather by punching and kicking him. Feather was bleeding from the mouth and appeared unconsious [sic].
>
> Kelly told SA Silkey and CI Peterson that he thought that Feather was knocked out so he and Jourdain left Feather laying on the ground outside bleeding from the mouth and went back into the residence and fell asleep.
>
> Kelly and Jourdain woke up the next morning and found Feather dead. They obtained shovels from another house, then dragged Feather into the brush and buried him.
>
> Kelly took the interviewers to a location in the woods near Jourdain's home and showed them the location where Feather was buried, the location where Kelly and Jourdain

had discovered Feather on the morning of August 27, 2006,
and identified other areas of interest.

Id. at p. 2.

At the Suppression Hearing, Jourdain argued that Egelhof omitted material, and

exculpatory information from his Affidavit, and that, had the Affidavit contained that

information, there would not have been probable cause for his arrest.

Under Franks v. Delaware, supra at 155-56, suppression is warranted if a

defendant makes the following showing: 1) the affiant omitted information with the

intent to make, or in reckless disregard of whether it made, the Affidavit misleading;

and 2) if supplemented with the omitted information, the Affidavit would not have

been sufficient to support a finding of probable cause. See, United States v. Jacobs,

986 F.2d 1231, 1234 (8th Cir. 1993). "Only if the affidavit as supplemented by the

omitted material could not have supported the existence of probable cause will

suppression be warranted." Id. [citations omitted]; see also, United States v. Hall, 171

F.3d 1133, 1143 (8th Cir. 1999)(requiring a defendant  to make a "'substantial

preliminary showing,' Franks, 438 U.S. at 171, 98 S.Ct. 2674, 'that the affiant omitted

facts with the intent to make, or in reckless disregard of whether the omissions made,

the affidavit misleading, and that the affidavit, if supplemented by the omitted

information, could not support a finding of probable cause.'"), citing <u>United States v.</u> <u>LaMorie</u>, 100 F.3d 547, 555 (8th Cir. 1996).

Given the Record presented, we find that there was ample probable cause to support the issuance of the Bench Warrant. Specifically, according to the Affidavit, the information that had already been gathered revealed that Jourdain, as well as Kelly, were involved in a fight with Feather on the date; that Jourdain had punched and kicked Feather; and that Jourdain left Feather bleeding on the ground. Egelhof also averred that Jourdain and Kelly, in a joint effort, buried Feather's body in the woods near Jourdain's home. In sum, we find these averments sufficient to establish probable cause for the issuance of a Bench Warrant for Jourdain's arrest, as to the charges alleged.

As for any asserted omissions, we understand Jourdain's arguments at the Hearing to intimate that Egelhof omitted certain of Kelly's statements from the beginning of his interview with Peterson, at which time, Kelly stated that Jourdain could "speak for himself" about the events leading to Feather's death, that "Kelly does not know if Jourdain hit or kicked Feather," and that "Kelly does not know what Jourdain did." See, <u>All Parties Joint Exh. 3</u>, at p. 2. Jourdain argues that Egelhof

intentionally, or recklessly, omitted from his Affidavit any mention of those previous statements of Kelly's uncertainty in regards to Jourdain's involvement.

While an inference may be drawn that missing information was recklessly omitted, in order for the inference to be valid, the omitted material must be "clearly critical" to the finding of probable cause.  See, United States v. Jacobs, supra at 1235. Here, the lack of Kelly's earlier statements in Egelhof's Affidavit is not clearly critical to a finding of probable cause.  First, Egelhof was not present when the Peterson interview was conducted with Kelly and, on the Record presented, we have no knowledge as to whether Egelhof was aware of Kelly's previous statements of uncertainty concerning the extent to which Jourdain fought with Feather.  See, United States v. Hall, 2006 WL 1520629 at *12 (E.D. Mo., May 31, 2006)(finding omissions in supporting affidavit did not warrant suppression, as "on this record there is no evidence that [the affiant] knew that [a witness] described Defendant at 5'5 or that she told conflicting stories," and that "[e]ven if he had reason to know of the information, the Court cannot find that the omission of such information was done with the intent to make the affidavit misleading or in reckless disregard of same.").  Moreover, even though Kelly may have "changed his story" in his later statements, we find that the inclusion of Kelly's initial statements as to Kelly's recollections of the fight would not

disturb a finding of probable cause, as to Jourdain.  See, United States v. Stropes, 387 F.3d 766, 769 (8th Cir. 2004)("[T]he omission of Mr. Blakely's initial false statements to the investigating officers and the omission of Mr. Blakely's criminal record did not make the affidavit misleading.").

While Jourdain may argue that the potential inconsistencies in Kelly's statements could ultimately undermine the credibility of Kelly's recounting of the altercation with Feather, we find that Egelhof's Affidavit contains ample information which would support a finding of probable cause concerning Jourdain's involvement in Feather's death -- by describing Jourdain's role in striking Feather, and his subsequent actions in leaving Jourdain outside, discovering his body, and assisting in the burial of Feather's body.   Therefore, the asserted omission of Kelly's previous statements was not "clearly critical" to the finding of probable cause, and therefore, we do not draw from that omission any reasonable inference that the omission was intentional, or reckless. Furthermore, Kelly's statements, which implicated Jourdain's role in Feather's death, were not made in an effort to deflect blame from himself, since Kelly continued to describe his role in an inculpatory manner.

Therefore, having found that Jourdain's arrest pursuant to a Bench Warrant was supported by adequate probable cause, we recommend that Jourdain's Motions to Suppress, based on a lack of probable cause for his arrest, be denied.[6]

       2.      <u>Jourdain's Motion to Suppress Statements</u>. We analyze Jourdain's Motion according to the same standards we previously applied to Kelly's paralleling Motion. In addition, we note that, if a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning." <u>Davis v. United States</u>, 512 U.S. 452, 457 (1994). To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of

---

[6]Even if we had concluded that probable cause for the issuance of the Bench Warrant were wanting, the Warrant was issued by an experienced Judicial Officer, upon whom the executing law enforcement agents had a good faith basis to rely. The Defendant does not urge, let alone demonstrate, that the Judicial Officer was other than "detached and neutral," was simply a mere "rubber stamp," or committed any specific error in the issuance of the Warrant, which should have deterred the searching officers' from reasonably relying on the Warrant. <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984), quoting <u>Aguilar v. Texas</u>, 378 U.S. 108, 111 (1964), abrogated on other grounds, <u>Illinois v. Gates</u>, 462 U.S. 213 (1983). While arising in the context of a Search Warrant, <u>Leon</u> has equal application to Arrest Warrants. See, <u>United States v. Johnson</u>, 121 F.3d 1141, 1143 (8th Cir. 1997), citing <u>Arizona v. Evans</u>, 514 U.S. 1 (1995), and <u>United States v. Teitloff</u>, 55 F.3d 391, 393 (8th Cir. 1995). As a consequence, even if probable cause were questionable, which it is not, we would recommend the denial of the Motions to Suppress on the basis of the good faith doctrine first enunciated in <u>Leon</u>.

a desire for the assistance of an attorney.'" Id. at 459, quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." Id. [emphasis in original]. In addition, "the Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), quoting McNeil v. Wisconsin, supra at 175; see also, Id. ("The filing of a criminal complaint and the issuance of an arrest warrant do not constitute the initiation of an adverse judicial proceeding."), citing United States v. Moore, 122 F.3d 1154, 1156 (8th Cir. 1997).

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" Davis v. United States, supra at 458, quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981). Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Id., citing North Carolina v.

Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).   The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights.  See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987).

Here, there is no dispute that Jourdain was in custody at the time that his statements were made to law enforcement, and that he made those statements during a custodial interrogation, after his arrival at the Crookston Police Department.  We have already addressed Jourdain's challenge to the validity of his arrest which, in any event, we found was supported by probable cause.  Moreover, the Record is uncontested that, prior to the interview, Jourdain was advised of his Miranda rights, and that he waived those rights by signing an "Advice of Rights" form, which contained the statement:  "I have read this statement of my rights and I understand what my rights are," and "[a]t this time, I am willing to answer questions without a lawyer present."  See, Government Exhibit 12.  Accordingly, since there is nothing in the Record to suggest that any of the officers utilized coercive tactics in the procurement of that waiver, we find that Jourdain knowingly, intelligently, and voluntarily, waived his Miranda rights.

In considering the totality of the circumstances, we do not believe that Jourdain's will was overborne by the questioning techniques that were employed by law enforcement.  Here, Thompson's uncontroverted testimony established that Jourdain made eye contact constantly throughout the course of the interview, and he appeared to be in good health.  In addition, Jourdain advised, at the beginning of his interview, that he "wanted to testify against what Robin did," and that he did not want to incriminate himself.  <u>All Parties Joint Exh. 4</u>, at p. 21.  While Jourdain asserts that his statements were involuntary, he has failed to support the assertion with any specific, and evidence-based, instances of coercion.  As we have detailed, Jourdain's interview was the product of his election to cooperate with law enforcement.  Jourdain does not contend that the length of the interrogation was unduly burdensome, that he was denied any of the normal accommodations of daily living, or that the agents duped him into lending his cooperation to their investigation.

Nor does he suggest, let alone prove, the existence of any physical, or mental impairments, which would adversely impact upon the voluntariness analysis, or urge any age-related naivety which would reflect a less than voluntary choice, on his part,

- 49 -

to answer law enforcement's questions.[7]  Further, we note that Thompson testified that the interview was terminated after Jourdain expressed a desire to cease the questioning.  Accordingly, we find that Jourdain was sufficiently aware of his ability to revoke his consent to the interview, which he did without any apparent prompting from law enforcement.

Finally, Jourdain advised Thompson that he had an attorney prior to the beginning of the interview.  Thompson testified that he expressly asked Jourdain if he wanted to speak to his attorney prior to waiving his rights, to which Jourdain responded by saying "no."  After expressing his desire to be interviewed without the presence of counsel, Jourdain signed the "Advice of Rights" form, which provided that "[a]t this time, I am willing to answer questions without a lawyer present."  See, Government Exh. 12.

Pursuant to Edwards v. Arizona, in the context of the Fifth Amendment, "[a] suspect who invokes the Miranda right to counsel may not be reapproached by police unless counsel is made available."  United States v. Harris, 221 F.3d 1048, 1051 (8th

---

[7]We do note that Jourdain was arrested after a stay at a detoxification center. However, Jourdain has not argued that he was under the influence of any drugs, or alcohol, that would impair his judgment or diminish his will, so as to render his statements involuntary.

Cir. 2000). However, as we have previously noted, in order to successfully invoke a right to counsel, a suspect's request must be unambiguous, and unequivocal. See, Davis v. United States, supra at 459; McNeil v. Wisconsin, supra at 178. Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." Id. [emphasis in original]. Accordingly, the question presented is whether Jourdain's statement, that he had a lawyer, constituted an unequivocal invocation of his right to counsel. We find that it did not.

In order to invoke his right to counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, supra at 459. Applying this standard, the United States Court of Appeals for the Seventh Circuit recently held that the question, "Can I have a lawyer," was an invocation of the right to counsel. See, United States v. Lee, 413 F.3d 622, 626 (7th Cir. 2005). Similarly, Courts have held that a statement such as "maybe I should talk to an attorney by the name of William Evans," see, Abela v. Martin, 380 F.3d 915, 926-27 (6th Cir. 2004), and "I'd just as soon have an attorney," see, Kyer v. Carlton,

146 F.3d 374, 379 (6th Cir. 1998), also constitute unequivocal invocations of the right to counsel.  See also, <u>Alvarez v. Gomez</u>, 185 F.3d 995, 998 (9th Cir. 1998)(finding the defendant's three questions: "Can I get an attorney right now," "You can have an attorney right now," and "Well, like right now you got one," considered together, constituted an unequivocal invocation); <u>United States v. Johnson</u>, 400 F.3d 187, 195 (4th Cir. 2005) (holding that suspect who checked "no" on a form which asked whether he "want[ed] to make a statement without his lawyer at this time," unequivocally invoked right to counsel ); <u>United States v. Miller</u>, 2005 WL 8475323 at 3 (D. Neb., December 20, 2005)("There is nothing unclear or equivocal about the statement 'I want to talk to my lawyer.'").

By way of contrast, the statement "Maybe I should talk to a lawyer," that was presented to the Supreme Court in <u>Davis v. United States</u>, supra at 455, was deemed equivocal, as were the statements "Do you know any good attorneys," see, <u>United States v. Kelly</u>, 329 F.3d 624, 630 (8th Cir. 2003), "I think I would like to talk to a lawyer," <u>Clark v. Murphy</u>, 331 F.3d 1062, 1065 (9th Cir. 2003), and "I think I need a lawyer," <u>Burket v. Angelone</u>, 208 F.3d 172, 198 (9th Cir. 2000), were considered equivocal.  See also, <u>United States v. Syslo</u>, 303 F.3d 860, 867 (8th Cir. 2002) (finding statement "I don't think I need an attorney for this" was equivocal); <u>United States v.</u>

Ramirez, 2002 WL 31933026 at *6-8 (S.D. Iowa, April 16, 2002)(holding that the defendant's question to an officer as to whether he thought that the defendant needed an attorney was equivocal); United States v. Segal, 207 F. Supp.2d 835, 841 (N.D. Ill. 2002)(holding that the defendant did not invoke his right to counsel, when he told the officers "you can talk to my lawyer"); Williams v. Larson, 2003 WL 1785807 (N.D. Cal., March 31, 2003)(holding that the defendant's statement, that he had talked to counsel who had told him not to talk, was not an invocation of the right to counsel); United States v. Sprouse II, 2002 WL 15866 (W.D. Va., January 8, 2002)(same); cf., Bruni v. Lewis, 847 F.2d 561, 564 (9th Cir. 1988)(holding that the defendant did not unambiguously invoke his right to counsel when he stated, in response to an officer's request that he answer questions, "[n]ot without my attorney," and then immediately added, "[w]ell, ask your questions and I will answer those I see fit").

In the context of a Habeas Petition, our Court of Appeals was recently presented with the question of whether a State Court's finding, that the statement, "Could I call my lawyer," was equivocal, constituted an unreasonable application of clearly established Federal law. See, Dormire v. Wilkinson, supra at 805. In its analysis, the Court noted that the State Court's conclusion was premised upon the principle announced in Davis, and the State Court had concluded that the petitioner did not

- 53 -

request the assistance of counsel, but only requested to call his attorney. The Court also noted that, since the interviewing officer had answered "yes" to the petitioner's question of whether he could call his lawyer, the State Court had found that the petitioner "was given the opportunity [to call an attorney], and for reasons only known to him, declined to do so." Id. at 803-04. Based on these findings, the Court held that the State Court's conclusion, that the petitioner's statement was equivocal, and did not constitute an unreasonable application of clearly established Federal law -- thereby reversing the holding of the District Court to the contrary. Id. at 805 ("[Petitioner's] question was not such a clear and unambiguous request for counsel that [the investigating officer] was required to stop his interrogation."); see also, United States v. Eastman, 256 F. Supp.2d 1012, 1019 n. 6 (D.S.D. 2003)(finding, in dicta, that the question, "Can I have a lawyer" "[w]as not an unequivocal request for counsel within the meaning of Davis and its progeny"), citing 2 W. LeFave, J. Israel, N. King, Criminal Procedure, §6.9(g) at pp. 609-112, n. 148; but see, United States v. Lee, supra at 626 (statement, "Can I have my lawyer" was proper invocation of Miranda).

Here, the statement given by Jourdain, that he "had a lawyer," was equivocal in the sense that it was reasonable for the officers to conclude that Jourdain was advising them of that fact, rather than asserting an interest in talking to the lawyer

before responding to the officers' questions.  See also, <u>United States v. Eastman</u>, supra at 1019, n. 6.  Moreover, as soon as Jourdain made this statement, Thompson asked him to clarify whether he wanted to speak with an attorney before proceeding with the interview, at which time, Jourdain expressed his desire to continue without the presence of his attorney.

Of course, we are mindful that, in <u>Davis</u>, the Supreme Court did not require the interviewing officers to ask clarifying questions following an equivocal invocation of counsel, but the Court certainly did not prohibit such a limited inquiry.  As the Court explained:

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. * * * Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel.  But we decline to adopt a rule requiring officers to ask clarifying questions.

<u>Id.</u> at 461-62.

Here, Thompson asked a clarifying question after Jourdain's reference to a lawyer.  Jourdain responded by clarifying that he was not invoking his right to the presence of counsel.  Shortly thereafter, Jourdain was advised of his rights under <u>Miranda</u>,

including his right to contact an attorney and, after stating that he understood his rights, Jourdain agreed to answer the officer's questions.

In sum, we are unable to find that "a reasonable officer in light of the circumstances would have understood" Jourdain's statement as a request to confer with counsel. See, <u>Davis v. United States</u>, supra at 459. Indeed, when directly questioned as to whether he wanted to speak with his attorney, Jourdain did not make such a request. Therefore, we find that Jourdain knowingly waived his right to speak with law enforcement without the presence of his lawyer. We further find that Jourdain's will was not over-borne and, under the totality of the circumstances, we conclude that his statements, which were made during the interview on August 29, 2006, were voluntary. In sum, we find no basis to suppress Jourdain's statements, and therefore, his Motion to Suppress those statements should be denied.

3.   <u>Jourdain's Motion to Suppress Evidence Obtained By Search and Seizure</u>.

Jourdain's Motion seeks our review of the Search Warrant for his residence, based upon the "four corners" of the Warrant and its supporting papers. No testimony was adduced, at the Suppression Hearing, concerning the execution of the Search Warrant, and we have already addressed the existence of probable cause for

Jourdain's arrest.  Therefore, our recounting of the facts is limited to those contained

in the Warrant's Application.

        a.      The Search Warrant, Supporting Affidavit, and Receipt.  On

August 29, 2006, a Search Warrant was executed at Jourdain's residence, in Red Lake,

Minnesota.   The Warrant was issued by a Magistrate Judge in this District, and it

authorized a search for human blood, hair, saliva and other bodily fluids, flesh

particles, full and empty alcoholic beverage containers, fingerprints, blood drips,

spatters, smears, wipe, fabric transfers, fabric fibers, bloody clothing, bloody

fingerprints, bloody footprints, clothing, and/or personal belongings of Feather and/or

Kelly, and indicia of ownership/occupation/habitation of the residence of Jourdain,

including but not limited to utility bills and deeds.  The Search Warrant authorized a

search of the residence, as well as the grounds of the Jourdain residence, including the

curtilage and two (2) vehicles present in the yard, on or before September 8, 2006.

See, Government Exh. 13.

      In support of the Search Warrant, Egelhof submitted an Affidavit in which he

averred that he had received information from other law enforcement officers, who

had summarized Kelly's statements made on August 28, 2006. The Affidavit recounts

that Kelly stated that he and Jourdain had beaten Feather to death and buried him

- 57 -

outside of the Jourdain residence. Kelly, Feather, and Jourdain, had been drinking, and Feather had been bleeding from his mouth, and appeared unconscious. Kelly and Jourdain obtained shovels from another house, dragged Feather's body into the brush, and buried him. Egelhof averred that Kelly took his interviewers to a location near the Jourdain residence, and showed them Feather's burial location, where they had discovered Feather's body on the morning of August 27, 2006, and observed "other areas of interest."

Egelhof averred that he was familiar with bloody crime scenes, and that, from his experience and training, he knew that it was common that "liquid blood from an outdoor assault scene can be easily tracked back into and/or deposited in an indoor location that the perpetrators visit after an assault." Affidavit of John Egelhof, Government Exh. 13, at p. 3. The Affidavit averred that Kelly made a statement that, "after beating Feather outside the Jourdain home, he and Jourdain went back into the residence," and that it was likely that Feather's blood, saliva, and other bodily fluids would be found inside of the Jourdain residence, in the form of drips, smears, splatters, fabric transfer patterns, fingerprints, and footprints. He also attested that they would find evidence, such as latent fingerprints, alcoholic beverage containers, clothing, fabric, fibers, hair, saliva, and personal belongings of Feather, and Kelly,

- 58 -

inside the Jourdain residence.  Further, Egelhof averred that there was probable cause to conclude that indicia of Jourdain's possession of the residence would be found in the Jourdain residence.  Egelhof provided additional details concerning the Jourdain residence, the curtilage, and the vehicles found at that residence.

The Evidence Recovery Log that is associated with the Search Warrant, records that a number of materials were seized from the Jourdain residence, as well as the surrounding curtilage.  The materials primarily consisted of clothing, a discolored substance found on a rock, remnants of a fire pit, plastic sheeting, unknown substances presumed to be body fluids, small sections of fibers and materials, alcoholic beverage containers, Jourdain's Court papers, and shovels.  Government Exh. 14.

b.      Legal Analysis.  Necessarily, we analyze the Search Warrant for Jourdain's residence under the same standard of review as we employed in considering Kelly's paralleling Motion.  Given the averments in Egelhof's Affidavit, as well as our previous discussion of probable cause for Jourdain's involvement in this matter,  there is unquestionably probable cause for the search of Jourdain's residence, and the surrounding curtilage, for biological samples, and other evidence surrounding Feather's death.  See, All Parties Joint Exh. 4., at pp. 18-19.

The Warrants which issued were sufficiently particularized, as to both the places to be searched, and the objects to be seized, and Jourdain draws no other infirmity in the Warrant to our attention, and our own independent review fails to disclose any.  In addition, we find that the information supporting the Search Warrant was not stale, given that not more than a day passed between Kelly's statements, and the execution of the Search Warrant.  Accordingly, we recommend that Jourdain's Motion to Suppress the evidence obtained by Search Warrant, be denied in all respects.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That Kelly's Motion to Suppress Confession or Statements [Docket No. 38] be denied.

2.      That Kelly's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 35] be denied.

3.      That Jourdain's Motion to Suppress Statements, Admissions, and Answers  [Docket No. 46] be denied.

4.     That Jourdain's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 45] be denied.

Dated:  November 8, 2006            *s/Raymond L. Erickson*
                                     Raymond L. Erickson
                                     CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than November 27, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than November 27, 2006**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.